IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UMPQUA BANK,

    Plaintiff,                                   No. CIV S-09-3208 WBS EFB

    vs.

FIRST AMERICAN TITLE
INSURANCE COMPANY,

    Defendant.                              <u>ORDER</u>

_____/

On March 2, 2011, the court heard plaintiff Umpqua Bank's ("Umpqua") motion to compel defendant First American Title Insurance Company ("First American") to produce documents. Dckt. No. 29. Attorney Darrell Martin appeared at the hearing on behalf of Umpqua; attorney Anthony Coss appeared on behalf of First American. For the reasons stated herein and on the record at the March 2 hearing, the motion to compel will be granted in part and denied in part, as set forth below.

This lawsuit arises from claims under two title insurance policies issued by First American in favor of Umpqua. Joint Statement Re: Discovery Disagreement ("Jt. Stmt."), Dckt. No. 32, at 2. Umpqua tendered claims to First American because a third party, A. Teichert & Sons, filed suit seeking foreclosure of mechanics' liens it asserted were senior in priority to Umpqua's deeds of trust. *Id.* First American denied coverage contending that: (1) the claims

were excluded under the policies; (2) Umpqua's settlement of Teichert's suit was unauthorized and in violation of the terms of the policies; (3) Umpqua did not give timely notice of the claims in violation of the terms of the policies; and (4) there was a lack of proof of damage. *Id.* Umpqua contends the denial was a deliberate breach of First American's policies of title insurance and was in bad faith. *Id.*

The primary dispute between the parties in this motion to compel is the scope and/or applicability of the attorney client privilege and work product doctrine, as they relate to Jeffrey Lowenthal, First American's coverage counsel. Umpqua contends that First American "is improperly shielding more than 1200 pages of documents that it claims are attorney-client communications or attorney work product, including the majority of its claims file relating to the two claims at issue in this dispute." *Id.* at 4. Umpqua argues that the facts establish that Lowenthal served as First American's claim adjuster, not its counsel, and that First American should not be permitted to shield the thoughts, impressions and analysis of its claim adjuster (including his claim file) from production just because he is an attorney, especially in a bad faith action such as this one, where the claims adjuster's file is indispensable evidence. *Id.* at 6-7. Umpqua further contends that "to the extent Mr. Lowenthal or his firm acted in a quasi-legal capacity, their communications still do not deserve protection because the nonlegal, and any arguably legal activities they performed, were so intertwined one cannot clearly distinguish between them." *Id.* at 7.

First American counters that Umpqua "is improperly attempting to obtain documents that were created as a result of First American's retention of an outside, independent attorney to provide a coverage opinion," and that the "documents are clearly protected under the attorney-client privilege and are not discoverable." *Id.* at 9. First American argues that Catherine Piraino was the claims adjustor and also is an attorney, that Piraino retained Lowenthal to provide a coverage opinion in this case, that he is not an employee or in-house counsel for First American, and that the communications between Lowenthal and First American were done as part and

parcel of the attorney-client relationship with an expectation that those communications would remain confidential. *Id.* at 10, 13; *see* also Piraino Aff., Dckt. No. 31, ¶¶ 1, 3, 8-10. First American contends that it has met its burden of establishing a prima facie claim that the communications were privileged, and that Umpqua now has the burden of proof to establish that the communications were not confidential or that the privilege does not apply for other reasons. *Id.* at 10-11. First American also contends that the communications and documents at issue are also protected by the work product doctrine because they contain Lowenthal's mental impressions. *Id.* at 14.

ATTORNEY CLIENT PRIVILEGE

The parties agree that in diversity actions such as this one, the attorney-client privilege is governed by state law. Fed. R. Evid. 501. Under California law, the attorney-client privilege, set forth at California Evidence Code section 954, confers a privilege on the client "to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer. . . ." Cal. Evid. Code. § 954. A confidential communication between client and lawyer is defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." Cal. Evid. Code § 952. "The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., a communication made in the course of an attorney-client relationship." *Costco Wholesale Corp. v. Super. Ct.*, 47 Cal.4th 725, 733 (2009) (citations omitted). "Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the

communication was not confidential or that the privilege does not for other reasons apply." *Id.*

Umpqua relies heavily on *2022 Ranch v. Superior Court*, which was also an insurance bad faith action and which involved communications that were transmitted to the insurer from its in-house claims adjusters who also were attorneys. 113 Cal.App.4th 1377, 1387 (2003). In *2022 Ranch*, the insurer claimed all the communications were privileged, as involving legal advice emanating from its attorneys, whereas the petitioner asserted none were, as the attorneys were serving merely as claims adjusters. *Id.* The California Court of Appeal distinguished communications reporting the results of factual investigations from those reflecting the rendering of legal advice, held only the latter were privileged, and ordered the trial court to review each of the communications to determine its dominant purpose. *Id.* at 1397.

However, in disapproving *2022 Ranch* in part, the California Supreme Court in *Costco*, specifically stated that in *2022 Ranch*, the court should first have "determine[d] the dominant purpose *of the relationship* between the insurance company and its in-house attorneys, i.e., was it one of attorney-client or one of claims adjuster-insurance corporation."[1] *Costco*, 47 Cal.4th at 739-40. According to the *Costco* court, "[t]he corporation, having the burden of establishing the preliminary fact that the communications were made during the course of an attorney-client relationship [would then be] free to request an in camera review of the communications to aid the trial court in making that determination, but the trial court [cannot] order disclosure of the information over the corporation's objection." *Id.* at 740. "If the trial court determined the communications were made during the course of an attorney-client relationship, the communications, including any reports of factual material, would be privileged, even though the factual material might be discoverable by some other means. If the trial court instead concluded that the dominant purpose of the relationship was not that of attorney and client, the

---

[1] Although Umpqua argues that "when applying this test, courts look to both (1) the dominant purpose for the communication, *and* (2) the dominant purpose of the attorney's work," citing *2022 Ranch,* 113 Cal.App.4th at 1390-91, the court in *Costco* specifically stated that the initial question should be about the dominant purpose of the *relationship.*

communications would not be subject to the attorney-client privilege and therefore would be generally discoverable." *Id.*; *see also Aetna Casualty & Surety Co. v. Superior Court*, 153 Cal.App.3d 471, 475 (1984).

The ultimate question raised here is whether Lowenthal was hired by First American to give his legal opinion *or* whether he was hired to take over the claims adjuster role and to shield First American from liability on any bad faith claim. Where the answer appears to be both, the court must make a determination of which purpose was primary. The court takes the consideration of that question very seriously, particularly in light of the critical importance of claims files to the litigation of an insurance bad faith claim, which is the cause of action asserted here. *See Reavis v. Metropolitan Prop. & Liab. Ins. Co.,* 117 F.R.D. 160, 164 (S.D. Cal. 1987). Admittedly, the court finds it suspicious that after being retained, Lowenthal became the only point of contact with Umpqua, Lowenthal retained an outside consulting expert to opine on the coverage issues raised in Umpqua's claims, and Lowenthal himself sent the May 26, 2009 coverage opinion letter directly to Umpqua's counsel. Such conduct suggests that his role for First American extended beyond that of outside claims counsel and into that of claims adjuster.[2] This suggests the very intertwining and ultimate blurring of lines between the roles of attorney and claims adjuster that the California courts have criticized. Indeed, California courts have noted that where the legal advice activities of the attorney "were so intertwined with activities which were wholly business or commercial [i.e., claims investing/adjusting] that a clean distinction between the two roles became impossible to make. This merging of business and legal activities jeopardizes the assertion of the attorney-client privilege, since the attorney and the client in effect have become indistinguishable." *2,022 Ranch*, 113 Cal.App.4th at 1393 (quoting *Chicago Title Ins. Co. v. Superior Court*, 174 Cal.App.3d 1142, 1154 (1985)).

---

[2] Although Umpqua argues that the retention letter from First American to Lowenthal suggests that Lowenthal was hired as a claims adjuster and not as coverage counsel, Jt. Stmt. at 6, the court finds that the retention letter, which states that Lowenthal was retained to assist "in identifying any loss under the subject policy" is ambiguous. Martin Decl., Dckt. No. 33, Ex. 1.

5

Nonetheless, this intermingling of roles does not relieve the court of the requirement that it make a determination as to which function predominated, even where the facts present a close call on the question. *Costco*, 47 Cal.4th at 739-40.

Although Lowenthal clearly performed both functions and the overlap has obscured the distinction, based on the representations of Catherine Piraino, First American's in-house claims counsel and the claims adjuster in this case, as well as the representations of First American's counsel at the March 2 hearing, the court finds that the *dominant purpose of the relationship* between First American and Lowenthal was in fact one of attorney-client, not claims adjuster-insurance corporation. Specifically, Piraino avers that (1) she is an attorney and claims counsel for First American and was also the claims adjuster assigned to this case, Piraino Aff. ¶¶ 1, 3; (2) she specifically retained Lowenthal, who was outside counsel, "to provide First American with a legal coverage opinion concerning the claims made by Umpqua" and, as part of that retention, authorized Lowenthal to conduct any necessary factual investigation and to directly contact Umpqua, *id.* ¶ 8; (3) "[a]ll communications between First American and Mr. Lowenthal were to be, and stay, confidential," *id.*; (4) "Lowenthal was not an employee of First American" during the time he was retained to provide a legal coverage opinion and has never been an employee of First American, *id.* ¶ 9; and (5) she authorized Lowenthal to issue a coverage letter directly to Umpqua's counsel "*after* Lowenthal provided First American with his legal opinions concerning the coverage issues," *id.* ¶ 10 (emphasis added). Additionally, at the March 2 hearing, First American's counsel represented that Piraino, as the claims adjuster, maintained her own claims file for this case and was the "ultimate decision-maker."

Accordingly, the court finds that First American has met its burden of establishing the preliminary facts necessary to support a prima facie claim of attorney-client privilege for information that was transmitted between Lowenthal and First American (1) in the course of their attorney-client relationship, (2) in confidence by a means which, so far as First American was aware, disclosed the information to no third persons other than those who were present to

6

1  further the interest of the client in the consultation or those to whom disclosure was reasonably
2  necessary for the transmission of the information or the accomplishment of the purpose for
3  which Lowenthal was consulted, *and* (3) which included a legal opinion formed and the advice
4  given by Lowenthal in the course of that relationship.  *See Costco Wholesale Corp.*, 47 Cal.4th at
5  733; *see also* Cal. Evid. Code § 952.  Because Umpqua has not, at this time, met its burden of
6  proof to establish that specific communications at issue that meet the definition prescribed above
7  were not confidential or that the privilege does not for other reasons apply, information that was
8  transmitted between Lowenthal and First American that meets the above definition of
9  confidential communications need not be disclosed by First American.

10 WORK PRODUCT DOCTRINE

11      First American also contends that certain documents at issue are protected by the work
12 product doctrine.  Jt. Stmt. at 14-15.  Umpqua, on the other hand, argues that the documents at
13 issue are not protected work product since this is a bad faith action and "[b]y assuming the role
14 of First American's agent, decision maker and claims adjuster, Mr. Lowenthal has made himself
15 the person most knowledgeable regarding the denial of Umpqua's claims."  Jt. Stmt. at 8 (citing
16 *Holmgren v. State Farm Mut. Auto Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992)).

17      As an initial point, it is unclear whether First American is withholding any documents on
18 the basis of attorney work product that are not otherwise protected by the attorney-client
19 privilege, as prescribed above.  However, to the extent that First American is withholding
20 documents on the basis of attorney work product alone, the court addresses the applicability of
21 the attorney work product doctrine.  Umpqua and First American both agree that because the
22 attorney work-product doctrine is not a privilege, it is governed by federal law.  Jt. Stmt. at 8, 15.

23      Here, First American has not met its burden of establishing that documents it is
24 withholding are protected by the work product doctrine.  *See Navigators Ins. Co. v. Calportland*
25 *Co.*, 2011 WL 219601, at *1 (W.D. Wash. Jan. 24, 2011) ("The party claiming work-product
26 protection bears the burden of establishing that it applies.").  The work product doctrine only

protects materials that were prepared in anticipation of litigation. *See* Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."). The phrase "in anticipation of litigation" has both temporal and motivational components. "[A]t the time she prepared the document, the attorney must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable," and "the party claiming the privilege must demonstrate that in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Equal Rights Ctr. v. Post Properties, Inc*., 247 F.R.D. 208, 210 (D.D.C. 2008); *United States v. Adlman* 134 F.3d 1194, 1200 (2nd Cir. 1998). Documents prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation are not protectable as work product. "Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created 'because of' actual or impending litigation." *See United States v. Adlman*, 134 F.3d at 1202; *see also Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 663-64 (S.D. Ind. 1991) (finding that an insurer's first-party claims files are presumptively not work product until a final decision is made to deny the insured's claim and that to overcome that presumption, the insurer "must demonstrate, by specific evidentiary proof of objective facts, that a reasonable anticipation of litigation existed when the document was produced, and that the document was prepared and used solely to prepare for the litigation, not to arrive at a (or buttress a tentative) claim decision."); *Fru-Con Const. Corp. v. Sacramento Mun. Utility Dist.*, 2006 WL 2050999, at *4, n.3 (E.D. Cal. July 20, 2006).

Here, First American specifically states that "the documents generated by Lowenthal were not generated during litigation, but were instead generated as part of the legal coverage opinion." Jt. Stmt. at 16. Accordingly, First American has not has not met its burden of

establishing that any documents it is withholding are protected by the work product doctrine.

Moreover, even if First American could establish that the documents at issue were prepared in anticipation of litigation and not in the ordinary course of business, work product may be discovered if it is otherwise discoverable under Rule 26(b)(1) and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3); *see also Hickman v. Taylor*, 329 US 495, 511 (1947). Even opinion work product, which receives the greatest protection, may be discovered "when mental impressions are *at issue* in a case and the need for the material is compelling." *Holmgren,* 976 F.2d at 577 (finding that "[i]n a bad faith insurance claim settlement case, the 'strategy, mental impressions and opinions of [the insurer's] agents concerning the handling of the claim are directly at issue'"). Here, Lowenthal played a key role in evaluating the coverage issues raised in Umpqua's claims and was, at the very least, an agent of First American who was involved in the handling of the claims. Therefore, his strategies, mental impressions, and opinions are at issue and Umpqua's need for information revealing those strategies, mental impressions, and opinions is compelling since Umpqua has no other way to probe the reasons for First American's denial of Umpqua's claims. Therefore, the work product doctrine is not a valid basis for First American to withhold documents from Lowenthal's claim file.

SPECIFIC DISCOVERY REQUESTS

　　A. Request for Production of Documents Number 1

Umpqua moves to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Number 1. The request seeks "YOUR entire claim file RELATED TO the CLAIMS."[3] According to First American, its entire claims file has now been

---

[3] CLAIMS is defined as "Umpqua's request for indemnification and/or defense under the POLICIES, submitted to First American on or about 1/20/08 by Peter Isola on behalf of Umpqua." POLICIES is defined as "(1) the complete policy of title insurance dated 11/1/04 issued by First American to Umpqua, and referred to as Policy Number CW-7471040, insuring

9

1 produced except documents that are protected under the attorney client privilege or the work
2 product doctrine. Jt. Stmt. at 12.

3 As stated above and for the reasons stated above, documents that are responsive to this
4 request and that are not protected by the attorney client privilege should be produced within
5 fourteen days of the date this order is filed.

6     B.   Request for Production of Documents Number 2

7 Umpqua also moves to compel First American to produce documents responsive to
8 Umpqua's Request for Production of Documents Number 2. The request seeks "Any and all
9 DOCUMENTS RELATED to the POLICIES." First American objects on the grounds of
10 attorney client privilege and work product, and also contends that the document request is vague
11 and overly broad. First American contends that its objection that the request is overly broad is
12 based on the fact that it "is not limited to a time period and encompasses underwriting files,
13 drafts of the form documents on which the policy forms were originally drafted years ago and
14 which may not exist, correspondence between the drafters of the form policies from which the
15 policies in this case were based, etc." Jt. Stmt. at 18.

16 As Umpqua notes, while the request "may cover a broad range of categories, it is all
17 appropriately limited by the fact that such documents should only relate to the policies at issue,
18 and the time period from their issuance to the present – hardly a limitless time period." Jt. Stmt.
19 at 17. The court finds that this request is not overly broad or vague. As stated above and for the
20 reasons stated above, documents that are responsive to this request and that are not protected by
21 the attorney client privilege should be produced within fourteen days of the date this order is
22 filed.

23 ////

24

25 Umpqua's loan number 150003538; and (2) the complete policy of title insurance dated 11/2/05
issued by First American to Umpqua, and referred to as Policy Number CW-8165002, insuring
26 Umpqua's loan number 68708581." Jt. Stmt. at 3.

10

### C. Request for Production of Documents Number 3

Umpqua moves to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Number 3. The request seeks "Any and all DOCUMENTS RELATED to the CLAIMS." First American contends that "Request No. 1 seeking the claims file would contain all the documents related to the claims" and that "First American has produced to plaintiff all documents related to the claims that are not protected and that are reasonably calculated to lead to the discovery of admissible evidence." Jt. Stmt. at 19.

As stated above and for the reasons stated above, documents that are responsive to this request and that are not protected by the attorney client privilege should be produced within fourteen days of the date this order is filed.

### D. Request for Production of Documents Numbers 4 and 5

Umpqua also moves to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Numbers 4 and 5. The requests seek "Any and all COMMUNICATIONS between YOU and LOWENTHAL REGARDING the POLICIES" and "Any and all COMMUNICATIONS between YOU and LOWENTHAL REGARDING the CLAIMS." First American objects to the production of documents, arguing that the requests "seek[] documentation that is protected under the attorney-client privilege and the work product doctrine." Jt. Stmt. at 20.

As stated above and for the reasons stated above, documents that are responsive to these requests and that are not protected by the attorney client privilege should be produced within fourteen days of the date this order is filed.

### E. Request for Production of Documents Numbers 14, 15, 24 and 25

Umpqua moves to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Numbers 14, 15, 24, and 25. The requests seek "Any and all COMMUNICATIONS between YOU and any other PERSON or third party not heretofore requested RELATED TO the CLAIMS," Request No. 14; "Any and all COMMUNICATIONS

11

1  between YOU and any other PERSON or third party not heretofore requested RELATED TO the
2  POLICIES," Request No. 15; "Any and all COMMUNICATIONS between LOWENTHAL and
3  any other PERSON or third party not heretofore requested RELATED TO the CLAIMS,"
4  Request No. 24; and "Any and all COMMUNICATIONS between LOWENTHAL and any other
5  PERSON or third party not heretofore requested RELATED TO the POLICIES," Request No.
6  25. First American objects to the production of documents responsive to these requests, arguing
7  that the requests seek documents protected by the attorney client privilege and work product, that
8  the requests are vague and ambiguous and are not related to any specific person, and are overly
9  broad since they are not limited as to time and scope. Jt. Stmt. at 21, 23, 24, 25.

10  Umpqua counters that, "[a]t a minimum, this request encapsulates any and all
11  communications to or from Lowenthal (and his firm) with consultant Steve Walker," and that
12  "[t]he express language of the only responsive document so far produced confirms that no
13  attorney-client relationship existed between Walker and Lowenthal nor Walker and First
14  American." Jt. Stmt. at 22 (citing Martin Aff., Ex. 4), 23, 24, 25. Umpqua further argues that
15  "Walker is First American's retained expert and has agreed to testify in this matter, rendering his
16  files, opinions, communications and other information received from counsel as wholly
17  discoverable." *Id.* Finally, Umpqua contends that First American's production on its face is
18  deficient since "the produced document from Mr. Walker states that he will supply billings to
19  Mr. Lowenthal for his services," but "First American's response does not agree to produce any
20  billings, and its privilege log does not identify any." *Id.*

21  First American responds that "Mr. Walker was retained by Mr. Lowenthal to assist in the
22  legal coverage analysis," and that because he was retained as a consulting expert, his
23  observations and opinions are irrelevant and not discoverable. Jt. Stmt. at 23, 24, 25. First
24  American contends that "all communications between Lowenthal and Walker are protected." *Id.*

25  Because it appears that these requests really seek communications with consultant Steve
26  Walker and because Umpqua has not identified any other individuals whose communications

12

Umpqua is seeking, these requests shall be limited to communications between First American and Walker related to the claims (14); communications between First American and Walker related to the policies (15); communications between Lowenthal and Walker related to the claims (24); and communications between Lowenthal and Walker related to the policies (25).

Here, Walker's retention agreement with Lowenthal made clear that he was hired by Lowenthal "as a consulting expert" and that he was "not being retained . . . as an attorney to represent" Lowenthal or First American. Martin Aff., Ex. 4. Therefore, although Walker is also an attorney, it appears that there was no direct attorney-client relationship between Walker and Lowenthal or between Walker and First American. However, in light of the attorney-client relationship between Lowenthal and First American, as discussed above, communications from First American to Walker, as Lowenthal's expert, would be protected by the privilege, but only to the extent that any disclosures from First American to Walker were reasonably necessary for the transmission of the information to Lowenthal.[4] Cal. Evid. Code § 952; *Nat'l Steel Prods. Co. v. Superior Court (Rosen)*, 164 Cal.App.3d 476, 483 (1985).

Additionally, in light of the attorney-client relationship between First American and Lowenthal, communications between Lowenthal and Walker which disclose any confidential communications between First American and Lowenthal (as defined in California Evidence Code § 952) are protected by the privilege, but only to the extent that the disclosure was "reasonably necessary for the transmission of the information or the accomplishment of the

---

[4] Although Umpqua contends that Walker has agreed to testify in this action, First American contends that Walker was retained as a consulting expert only. While it is true that Rule 26 requires the disclosure of the identity of experts who have been retained or specially employed to provide expert testimony in a case, as well as their opinions and certain other information, in light of First American's representation that Walker is not a testifying expert, that information need not be disclosed at this time. Fed. R. Civ. P. 26(a)(2),(b)(4). Facts known or opinions held by an expert who has been retained or specially employed in anticipation of litigation or preparation for trial (i.e., a consultant) and who is not expected to be called as a witness at trial are generally only discoverable "on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D)(ii). Here, Umpqua has not shown (or even argued) any such exceptional circumstances.

purpose for which the lawyer is consulted." Cal. Evid. Code § 952; *see also* Cal. Evid. Code § 912(d) ("A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege), . . . when disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer . . . was consulted, is not a waiver of the privilege."); *Nat'l Steel Prods. Co.*, 164 Cal.App.3d at 484. However, other communications between Lowenthal and Walker are *not* protected by the attorney-client privilege, even though Walker was Lowenthal's consulting agent, unless they concern information which emanated directly from First American. *See Great Am. Surplus Lines Ins. Co. v. Ace Oil*, 120 F.R.D. 533, 538 (E.D. Cal. 1988) ("The attorney-client privilege does not apply to this document because communications between an expert and an attorney are not privileged unless they concern information which emanates directly from the client.").

Documents that are responsive to these requests and that are not protected by the attorney client privilege, as provided herein, should be produced within fourteen days of the date this order is filed.

F.  Request for Production of Documents Number 26

Umpqua moves to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Number 26. The request seeks "YOUR claims manual(s) in effect from 2005 to 2010 for handling and responding to title insurance claims by insured lenders." First American objects to the production of documents, arguing that the request is vague and ambiguous because "claim manual" is not a defined term, that the request for claims manuals in effect from 2005 to 2010 is overly broad due to the fact that the investigation conducted by First American does not encompass these time frames, that the request for all the claims manuals with regards to responding to any "title insurance claims by insured lenders" is overly broad and encompasses claims that have absolutely nothing to do with the underlying mechanic's lien and stop notice claims that form the basis of this action, that any such "claims manual" would be privileged and subject to privacy rights and are proprietary, and that any such

"claims manuals," to the extent they exist, would be general in nature and designed merely as a summary guideline and would not be material to the facts of this case as they would be intended to apply to all claims as presented in any state in the country. Jt. Stmt. at 26, 27.

As Umpqua points out, because Umpqua alleges that First American denied the claims at issue in bad faith, "what instructions First American provides to its employees for the proper processing and evaluating of claims is highly relevant." Jt. Stmt. at 27. Additionally, the court finds that this request is not overly broad or vague. However, in light of First American's assertion that the responsive documents are confidential and proprietary, the parties are directed to meet and confer and prepare a proposed stipulated protective order to be submitted to the court, as provided in Eastern District of California Local Rule 141.1. Within fourteen days after any such protective order is issued, First American shall produce all documents responsive to this request.

G.  Request for Production of Documents Numbers 27, 28, and 29

Umpqua also moves to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Numbers 27, 28, and 29. The requests seek "Any and all DOCUMENTS RELATED TO YOUR written policies, practices or procedures from 2005 to 2010 REGARDING how YOU responded to title insurance claims by insured lenders . . . " for loss of lien priority due to mechanics' lien claims, Request No. 27, for loss due to stop notice claims, Request No. 28, and for claims where a claimant asserted both a stop notice and mechanics' lien claim, Request No. 29. First American objects to the production of documents, arguing that the timeframe of 2005 to 2010 is overly broad and that responding would be unduly burdensome in that it would require First American to go through thousands of claims files to determine which involved mechanic's liens and/or stop notices and how each claim was handled. Such a search would be extremely time consuming and expensive and is simply not required by the facts of this case. Jt. Stmt. at 28, 30, 31-32; Piraino Aff. ¶ 11. First American also objects on the ground that because "stop notice claims are not covered under the

title insurance policies," "First American should not be forced to conduct extensive research of its files (as set forth above) to produce files involving stop notice claims." Jt. Stmt. at 32.

As Umpqua points out, in light of Umpqua's bad faith claim against First American, "First American's instructions to its employees for processing and evaluating claims is highly relevant." Jt. Stmt. at 28, 31.  This includes First American's instructions to its employees for processing and evaluating claims where a claimant asserted both a stop notice and mechanics' lien claim.  However, given the significant burden of responding to these requests, as outlined in Ms. Piraino's affidavit, these requests shall be limited to written policies, practices or procedures that First American had in place *generally* from 2005 to 2010 regarding how First American responded to title insurance claims by insured lenders for loss of lien priority due to mechanics' lien claims, for loss due to stop notice claims, and for claims where a claimant asserted both a stop notice and mechanics' lien claim.  In other words, First American need *only* produce those policies, practices or procedures that First American provided to its employees as instructions for processing and evaluating these types of claims, and need *not* review every single policy and claims file pertaining to those types of claims.  First American's responses to these requests, as limited herein, shall be produced within fourteen days of the date this order is filed.

H.  Request for Production of Documents Numbers 30 and 31

Umpqua moves to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Numbers 30 and 31.  The requests seek "[a]ny and all DOCUMENTS RELATED to YOUR inspection of the PROPERTY prior to issuance of the POLICIES" and "[a]ny and all COMMUNICATIONS RELATED to YOUR inspection of the PROPERTY prior to issuance of the POLICIES."  First American contends that it "is not in possession of any documents or communications related to any type of inspection of the property," and that any documents that First American does have were already produced.  Jt. Stmt. at 33, 34.

////

Because it appears that there is nothing further to compel First American to produce with regard to Requests 30 and 31, Umpqua's motion to compel further responses to those requests is denied.

I. Request for Production of Documents Number 33

Umpqua originally moved to compel First American to produce documents responsive to Umpqua's Request for Production of Documents Number 33. However, Umpqua withdrew that motion at the March 2 hearing.

CONCLUSION

In accordance with the foregoing, IT IS HEREBY ORDERED that Umpqua's motion to compel, Dckt. No. 29, is granted in part and denied in part as provided herein.

SO ORDERED.

DATED: March 17, 2011.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE